**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.  09-60973-CIV-ALTONAGA/BROWN

TRANSAMERICA CORPORATION,

     Plaintiff,

vs.

MONIKER ONLINE SERVICES, LLC,
OVERSEE.NET, MONIKER PRIVACY
SERVICES, INC., and JOHN DOES 1-10
a/k/a "H.W. Barnes," "Domains Ventures,"
and "Domain Park Limited,"

     Defendants.

_____/

**DEFENDANTS MONIKER ONLINE SERVICES, MONIKER PRIVACY**
**SERVICES, AND OVERSEE.NET'S, MOTION TO DISMISS**

     Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants,

Moniker Online Services, LLC ("Moniker"), Moniker Privacy Services, LLC ("MPS"), and

Oversee.net ("Oversee") (collectively, the "Moniker Defendants"), move for dismissal of the

claims set forth in the First Amended Complaint ("FAC").

**I.       INTRODUCTION**

     Plaintiff's FAC centers on the allegedly infringing use of domain names by John Doe

Defendants which use Plaintiff alleges violate its TRANSAMERICA mark.  The question

presented in this motion is whether Moniker (a registrar), MPS (a privacy service), and

Oversee (the parent company) can be directly or contributorily liable for the actions of the

John Doe Defendants.  The Moniker Defendants respectfully submit that this question must

be answered in the negative.

<div style="border:1px solid black; display:inline-block; padding:4px;">

**EXHIBIT**

**D**

</div>

None of the Moniker Defendants engage in any activity which would trigger liability for direct service mark infringement, cybersquatting, counterfeiting, or dilution.  Courts have repeatedly held that registering a domain name with ICANN on behalf of a third party registrant – which is what Moniker does as a registrar – does not constitute "use in commerce" under the Lanham Act.  Providing privacy services for registrants – which is what MPS does – certainly does not result in "use in commerce" of a trademark.  And, there is no allegation of fact in the Complaint which suggests that Oversee has done anything other than be a parent company for Moniker and MPS.

Neither has any Moniker Defendant engaged in an activity which would result in the imposition of contributory liability.  The FAC merely alleges that Moniker provides "monetization" services to its registrants.  Even assuming that is true for purposes of this motion, the mere provision of monetization services (which can be used in a legitimate, non-infringing manner) is not sufficient to trigger contributory liability.  To establish that cause of action, Plaintiff must prove that (i) Moniker used the monetization services to induce infringement or (ii) Moniker had knowledge of a specific incident of infringement of a TRANSAMERICA mark and had direct control over the infringing instrumentality, such that it had the power to stop the infringement.  The FAC does not allege any of this.  In fact, Moniker does *not* induce its clients to infringe the trademarks of others.  Nor did Moniker have knowledge that a third party was infringing a TRANSAMERICA mark.  Nor does Moniker have direct control over the infringing instrumentality—the domain name—which is owned by the third party registrant.

For all these reasons, the Moniker Defendants respectfully request that the FAC be dismissed in its entirety as against them.

## II.      STATEMENT OF FACTS

In 1998, Congress created the Internet Corporation for Assigned Names and Numbers ("ICANN") to administer the Internet Domain Name System (DNS).  FAC at ¶ 44. Moniker is accredited by ICANN to register Internet domain names on behalf of third parties and the public.  *Id.* at ¶ 49.  MPS provides privacy services which protects the identity of Moniker's customers (*i.e.*, the John Doe Defendants) from unwanted public disclosure.  *Id.* at ¶ 51.  Oversee is the parent company of Moniker.  *Id.* at ¶14.

## III.      ARGUMENT

### A.      TO SURVIVE A MOTION TO DISMISS, PLAINTIFF MUST ALLEGE FACTS NOT MERELY RECITE FORMULAIC AND CONCLUSORY ALLEGATIONS.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007).  "The plausibility standard is not akin to a 'probability requirement," but it asks for more than a sheer possibility that a defendants has acted unlawfully. . . .  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, ___ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'-'that the pleader is entitled to relief.'"  *Id.* at 1950 (*citing* Fed. R. Civ. P. 8(a)(2)).  *See also Family Watchdog, LLC v. Schweiss*, 2009 WL 2151152, *6-7 (M.D. Fla., July 13, 2009) (applying *Iqbal* and *Twombly* to dismiss plaintiff's infringement claims as "shotgun pleading.")

**B.    THE FAILURE TO PLEAD USE IN COMMERCE IS FATAL TO PLAINTIFFS'
         DIRECT CLAIMS OF INFRINGEMENT.**

Plaintiff's first claim for federal service mark counterfeiting requires that the Moniker

Defendants "use in commerce…any counterfeit…in connection with the sale, offering of

sale, distribution, or advertising of any goods or service…"  15 U.S.C. § 1114(1)(a).  *See*

*Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1242

(11th Cir. 2007) ("The first step of a trademark infringement action is to demonstrate an

unauthorized 'use' of the plaintiff's mark in commerce.")  The FAC makes no allegation that

the Moniker Defendants used a TRANSAMERICA counterfeit in connection with the sale or

offering of sale for services.  Instead, the FAC alleges that Moniker (i) registers domain

names to fictitious business entities and (ii) conceals their identity from the public

(presumably through MPS).  FAC at ¶¶ 92-93.  There is no allegation that Oversee, the

parent company, uses a TRANSAMERICA mark in commerce in connection with sale of

services.

The failure to plead "use in commerce in connection with a sale" is not surprising.  As

a registrar, Moniker simply registers a domain name with ICANN on behalf of a third party;

its role ends there.  *See Bird v. Parsons*, 289 F.3d 865, 878 (6th Cir. 2002) ("A registrar that

grants a particular domain name to a registrant simply grants it an address….The fact that

the registrant can then use its domain name to infringe the rights of a registered trademark

owner does not subject the registrar to liability for trademark infringement or unfair

competition."); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 956-59

(C.D. Cal. 1997) ("*Lockheed I*"), *aff'd,* 194 F.3d 980 (9th Cir. 1999) ("*Lockheed II*")

("[Registrar] merely uses domain names to designate host computers on the Internet.  This

is the type of purely 'nominative' function that is not prohibited by trademark law."); *accord*

*Optimum Technologies*, 496 F.3d 1231 at 1242-44 (infringing use in commerce by retailers

does not render distributor liable for direct infringement).  MPS provides privacy services so that MPS' contact information appears in the WHOIS record, but it never interacts with the domain name registration process or web site hosting process at all.  If a registrar cannot be held liable for trademark infringement, a privacy service cannot be held liable either.

The same analysis applies to Plaintiff's third claim for direct federal service mark infringement which is governed by the same statute, 15 U.S.C. § 1114(1)(a).  Allegations that Moniker registered domain names to "evil doers" and hid their identity are not allegations of use of the TRANSAMERICA mark in commerce in connection with the sale or offering of sale of a service.  Plaintiff's seventh claim for designation of origin also requires use in commerce in connection with goods and services and, therefore, fails for the same reason.  15 U.S.C. § 1125(a) (establishing liability for "[a]ny person who, on or in connection with goods or services…uses in commerce any word…").

Plaintiff's claims for dilution also fail for the same reason.  The federal dilution statute, 15 U.S.C. § 1125(c), requires a "person…who commences use of a mark or trade name in commerce…").  The Florida dilution statute, modeled after the federal statute permits a trademark holder to enjoin "another person's commercial use of a mark or trade name."  Fla. Stat. § 495.151.  But, as case law makes clear, "the acceptance of domain name registrations is not a 'commercial use' within the meaning of [15 U.S.C. 1125(c)]." *Bird*, 289 F.3d at 879 citing *Lockheed I*, 985 F. Supp. at 956-59.

For the foregoing reasons, Plaintiff's claims of direct trademark infringement and dilution fail as against the Moniker Defendants.

### C. THE FAILURE TO PLEAD EITHER INDUCEMENT OR KNOWLEDGE AND CONTROL IS FATAL TO PLAINTIFFS' CLAIMS OF CONTRIBUTORY INFRINGEMENT.

Plaintiff's second claim is for contributory service mark counterfeiting, and its fourth claim is for contributory service mark infringement.  Contributory infringement requires "both an allegation of a direct infringement by a third party, *and an allegation of an intentional or knowing contribution to that infringement by the defendant*."  *Optimum Technologies*, 496 F.3d at 1245 (*citing Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982)) (emphasis added)*; Mini Maid Services Co. v. Maid Brigade Systems, Inc.,* 967 F.2d 1516, 1522 (11th Cir. 1992) (relying upon *Inwood Labs* for its conclusion that a "franchisor may be held accountable only if it intentionally induced its franchisees to infringe another's trademark or if it knowingly participated in a scheme of trademark infringement carried out by its franchisees.").  *See also Perfect 10, Inc. v. Visa Intern. Service Ass'n.*, 494 F.3d 788, 807 (9th Cir. 2007) ("*Visa*") ("To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied.") (*citing Inwood Labs.,* 456 U.S. at 855).

 "[A]ny liability for contributory infringement will necessarily depend upon whether or not the contributing party intended to participate in the infringement or actually knew about the infringing activities."  *Mini Maid Services*, 967 F.2d at 1522.  "When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by the defendant over the third party's means of infringement.'"  *Visa*, 494 F.3d at 807 (*citing Lockheed II*, 194 F.3d at 984).  "For liability to attach, there must be '[d]irect control and monitoring of the instrumentality used

by a third party to infringe the plaintiff's mark.'"  *Id.*  Even when the alleged contributory

infringer has the right to exercise some control over the direct infringer, such as in a

franchisor–franchisee relationship, the court must specifically "decide whether or not the

franchisor explicitly or implicitly encouraged the trademark violations."  *Mini Maid Services,*

967 F.2d at 1522 (reversing lower court for focusing on "reasonable diligence" of

franchisor's supervision over franchisee instead of properly focusing on "whether or not the

defendants intentionally induced infringing acts or actively participated in any infringement

scheme).

    Here, there is no any allegation that the Moniker Defendants intentionally induced its

customers to infringe the Transamerica marks.  At worst, Plaintiff is arguing that Moniker

generally assists infringing registrants by registering the domain names, keeping their

identity a secret, and offering monetizing services (FAC at ¶¶ 110-114), but that allegation

is insufficient to meet this prong.  *See Visa*, 494 F.3d at 807 (allegations that defendant had

provided "critical support" to infringers not sufficient because "these allegations [] cite no

affirmative acts by Defendants suggesting that third parties infringe [Plaintiff's] marks much

less induce them to do so.").

    As to the second prong, the FAC does not allege that (i) Moniker had specific

knowledge of infringement or (ii) that it had direct control over the infringing instrumentality.

Without specific knowledge of infringement, Moniker cannot be contributorily liable.  *See*

*Lockheed I*, 985 F. Supp. 963 (even though registrar received letters from Plaintiff

complaining about the registration of domain names incorporating Plaintiff's

SKUNKWORKS mark, that was not sufficient to impute knowledge of infringement because

"[t]he use of identical or similar marks does not necessarily constitute infringement.");

*Academy of Motion Picture Arts and Sciences v. Network Solutions, Inc.*, 989 F. Supp. 1276

(C.D. Cal. 1997) ("Here, there has yet to be a determination as to whether or not the domain names at issue infringe the Lanham Act—therefore [registrar] could not possibly have actual knowledge that the registered owners of the domain names at issue are involved in infringing activities."); *cf. Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ("computer system operator can be held contributorily liable if it has *actual* knowledge that *specific* infringing material is available using its systems…") (emphasis in the original).[1]  The requirement that Moniker have knowledge of an infringing use of a TRANSAMERICA mark is particularly important here because the mark – TRANSAMERICA, an amalgamation of the prefix "Tran" and America to mean "across America" – can have a generic or descriptive meanings or can be legitimately used by others.[2]  *See Lockheed* I, at 964 ("The existence of numerous legitimate, non-infringing uses of the term 'skunk works' further illustrates the uncertainty inherent in the question of whether NSI knew or had reason to know of infringing uses of domain name registrations.").

In addition, Plaintiffs cannot meet the additional hurdle of showing "direct control" over the infringing instrumentality (*i.e.*, the domain name).  It is clear from the FAC that Moniker and MPS are providing services not products, and, therefore, for liability to attach, there must be "direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark."  *Visa*, 494 F.3d at 807 (*citing Lockheed II*, 194 F.3d at 984).  There is no allegation that the Moniker Defendants have "direct control and monitoring" of

---

[1] Moniker Defendants realize that this statement was made in the context of analyzing contributory copyright infringement.  That said, it is universally accepted that contributory trademark infringement is even narrower than contributory copyright infringement.  Thus, the level of knowledge required in the trademark context must necessarily be greater than the level required in the copyright context.  *See Visa*, 494 F.3d at 806 ("The tests for secondary trademark infringement are even more difficult to satisfy than those required to find secondary copyright infringement.") (*citing Sony Corp. v. Universal City Studios*, 464 U.S. 417, 439 n.19, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d. 259, 265 (9th Cir. 1996) ("trademark infringement liability is more narrowly circumscribed than copyright infringement.").

[2] An online search of the trademark database at the U.S. Patent & Trademark Office revealed 119 different records in response to a search for "Transamerica."

the offending domain names.  This is not surprising because, in fact, the Moniker

Defendants do not have such direct control.  A domain name is owned and controlled by the

registrant not the registrar or privacy service provider.  It is the registrant who chooses what

to do with that domain name.  *See Oscars v. Network Solutions, Inc.*, 989 F. Supp. 1276,

1281 (C.D. Cal. 1997) (registrar has no idea "how a registrant will use a domain name").  A

domain name registrant who registered <www.transamericalifeinsurance.com> could just as

easily populate that domain name with web pages in which he decried Transamerica (a use

that would be protected by the "Fair Use Doctrine" and the First Amendment) as they could

set up an infringing website.  But, that is not for the Moniker Defendants to decide or

control.  *See Lockheed I*, at 962 ("A domain name, once registered, can be used in

connection with thousands of pages of constantly changing information.  While the landlord

of a flea market might reasonably be expected to monitor the merchandise sold on his

premises, [registrar] cannot reasonably be expected to monitor the Internet.").

 If the Moniker defendants did not induce infringement, did not know of the specific

infringement of the Transamerica marks, and do not have any control over the offending

domain names, then there can be no contributory infringement.

  **D. PLAINTIFF'S DIRECT AND CONTRIBUTORY CLAIMS FOR
   CYBERSQUATTING ALSO FAIL.**

 The cause of action colloquially referred to as "cybersquatting" stems from the Anti-

Cybersquatting Protection Act ("ACPA), codified at 15 U.S.C. § 1125(d).  ACPA liability

requires a person to register, traffic in or use a domain name that is identical to or

confusingly similar to a mark with a bad faith intent to profit from that mark.  *Id.*  A person

will be liable for "using" a domain name in violation of the ACPA only if that person is the

domain name registrant or that registrant's authorized licensee.  15 U.S.C. §

1125(d)(1)(D).

**1.       Registrars Are Not Liable for Cybersquatting Liability as a Matter of Law.**

Time and again, courts that have examined the ACPA have ruled that registrars such

as Moniker cannot be liable under the ACPA.  As the leading decision in this realm

succinctly explained:

> Having studied the language of § 1125(d)…the court cannot conclude that it creates a cause of action against defendant as a domain name registrar or registry.  There is no summary judgment evidence that plaintiff [sic] is a person who has had a "bad faith intent to profit from" specific marks, 15 U.S.C. § 1125(d)(1)(A)(i), that are registered with it or contained in its registry.  That the court's interpretation of "intent to profit from that mark" is correct is supported by § 1125(d)(1)(B)(i), which lists factors the court may consider in determining whether a person has a bad faith intent.  Although the list is not exclusive, none of the conditions and conduct listed would be applicable to a person functioning solely as a registrar or registry of domain names.
>
> Moreover, the court has concluded that there is no summary judgment evidence that defendant fits within the (ii) clause of 1125(d)(1)(A) [requiring registration, trafficking in, or use of a domain name]…

*Lockheed Martin Corporation v. Network Solutions, Inc.,* 141 F. Supp. 2d 648, 654-55 (N.D.

Tex. 2001) ("*Lockheed III*").

Of course, it makes sense from a policy perspective why registrars are not subject to

ACPA liability.  As the *Lockheed III* Court explains:

> It is quite understandable that Congress did not cause defendant as a domain name registrar, or as a keeper of the registry, to be subject to civil liability under § 1125(d).  Although plaintiff now tries to backtrack somewhat from the position that defendant as registrar should perform gatekeeper functions for mark owners, even the modified gatekeeper role it now proposes is untenable.  Sheer volume alone would prohibit defendant performing the role plaintiff would assign.  Defendant simply could not function as a registrar, or as keeper of the registry, if it had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name.  The fact that defendant could theoretically do what plaintiff asks does not mean that defendant is obligated to do so at the risk of financial ruin.  The reason the UDRP was developed was to provide the mechanism to resolve

> these disputes.  Not only would imposing plaintiff's scheme render
> the UDRP nugatory, it would cause the domain name registration
> system in its entirety not to be feasible.

*Id.* at 655.  *See also Davies v. Afilias Ltd.*, 293 F. Supp. 2d 1265, 1272 (M.D. Fla. 2003)

(domain name registry not liable for reverse domain name hijacking under ACPA).

For the foregoing reasons, Moniker cannot be held liable as a registrar under the

ACPA.  Following a similar analysis, MPS cannot be liable because there is no allegation

it has "registered, used or trafficked in" an offending domain name. MPS merely provided

privacy services.  The same is true of Oversee, for which there is no specific allegation of

fact in the FAC as to why it would be liable under the ACPA.

**2.      There Is No Allegation of Fact Which Would Support ACPA Liability
Outside of the Registrar Context.**

**a.      There is no allegation of fact establishing registration, use, or
trafficking.**

Undoubtedly cognizant of the fact that Moniker cannot be held liable as a registrar

under the ACPA, the FAC offers the allegations in Paragraphs 126 and 133 (worded

differently but ultimately meaning the same) in which Plaintiff essentially alleges that the

Moniker Defendants (and Moniker individually), as licensees of the John Doe Defendants,

have registered, used, or trafficked in domain names with the bad faith intent to profit from

the goodwill associated with the Transamerica marks.  These allegations are simply

conclusory allegations that formulaically recite the elements of § 1125(d) and should be

disregarded.  As the *Iqbal* Court explained in disregarding the allegation that the Attorney

General knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh

conditions of confinement as a matter of policy, solely on account of [his] religion, race,

and/or national origin and for no legitimate penological interest:

> These bare assertions, much like the pleading of conspiracy in
> *Twombly*, amount to nothing more than a "formulaic recitation of the

> elements" of a constitutional discrimination claim.  To be clear, we
> do not reject these bald allegations on the ground that they are
> unrealistic or nonsensical…It is the conclusory nature of
> respondent's allegations, rather than their extravagantly fanciful
> nature, that disentitles them to the presumption of truth.

*Iqbal*, 129 S. Ct. at 1951.

That Plaintiff cannot make non-conclusory allegations of fact to support its claim for

relief is both telling and undisputed.

First, Plaintiff cannot allege that the Moniker Defendants registered the domain

names because, as used in 15 U.S.C. § 1125(d), the term "register" refers to the act of a

registrant registering the domain name through a registrar not to the act of a registrar

registering a domain name with ICANN on behalf of a registrant. *Lockheed III*, 141 F.

Supp. 2d at 655 ("The word 'registers,' when considered in context, obviously refers to a

person who presents a domain name for registration, not to the registrar.").  It is

undisputed that the John Doe Defendants registered the domain names at issue.

Second, Plaintiff cannot allege that the Moniker Defendants use the domain name

because "use" is limited by statute to the domain name registrant or their authorized

licensee.  Again, it is undisputed that the domain name registrants are the John Doe

Defendants.  And, while Plaintiff makes a conclusory statement that Moniker is an

authorized licensee, it provides no statement of fact to support that conclusion.  It certainly

does not point to any license between the parties which creates the licensee relationship.

Third, Plaintiff cannot allege facts which show that the Moniker Defendants traffic in

the offending domain names which is specifically limited by statute to sales, purchases,

loans, pledges, licenses, exchanges of currency, and any other transfer for consideration

or receipt in exchange for consideration.  15 U.S.C. § 1125(d)(1)(E).  While the FAC

alleges (again, in conclusory fashion), that the Moniker Defendants have trafficked in the

domain names, the FAC does not plead a single fact regarding a sale, purchase, loan, pledge, license, exchange of currency or transfer for consideration which would support such an allegation.  This is not surprising because the role of the registrar is limited to registration and nothing else.  *See, e.g., Lockheed III*, 141 F. Supp. 2d at 655.

Put a different way, the statutory scheme of the ACPA actually requires the transfer of property before liability will attach under the "trafficking" prong.  *Ford Motors Co. v. Greatdomains.com, Inc.*, 177 F. Supp. 2d 635, 646 (E.D. Mich. 2001) (analyzing the phrase "traffics in" and concluding "that, in addition to the plain meaning of 'traffics in,' the bad faith element further mandates that the ACPA be limited in its application to persons directly transferring or receiving a property interest in the domain name at issue.").  Here, the FAC has not alleged any transfer of property from or to the Moniker Defendants and, thus, there can be no ACPA liability.

>       **b.    There is no allegation of fact establishing a specific, bad-faith intent to profit from the Transamerica marks.**

The bad faith required to support a cybersquatting claim is not general bad faith, but "a bad faith intent to profit *from the mark,*" 15 U.S.C. § 1125(d)(1)(A)(I), which is to say the mark at issue in the lawsuit.  *See Southern Grouts & Mortars, Inc. v. 3M Co.*, 2009 WL 2182605, *6 (11th Cir., Jul 23, 2009) ("The Act provides a cause of action for a trademark owner against a person who 'has a bad faith intent to profit from [the owner's] mark").  Thus, Plaintiff's references to various UDRP proceedings involving other clients and/or other marks are irrelevant.  Plaintiff must plead that the Moniker Defendants intended to profit specifically from the goodwill associated with the Transamerica marks.  *See generally Southern Grouts,* at *8-9; Lucas Nursery and Landscaping, Inc. v. Grosse,* 359 F.3d 806, 810 (6th Cir. 2004) ("In its report on the ACPA, the Senate Judiciary Committee distilled the crucial elements of bad faith to mean an 'intent to trade on the goodwill of

another's mark'") (quoting S. Rep. No. 106-140, at 9); *Sporty's Farm L.L.C. v. Sportsman's*

*Mkt., Inc.,* 202 F.3d 489, 495 (2d Cir. 2000) (Congress enacted the ACPA "'to protect

consumers and American businesses, to promote the growth of online commerce, and to

provide clarity in the law for trademark owners by prohibiting bad-faith and abusive

registration of distinctive marks as Internet domain names *with the intent to profit from the*

*goodwill associated with such marks*'") (quoting S. Rep. No. 106-140, at 4) (emphasis

added); *Healix Infusion Therapy, Inc. v. Murphy,* Civil Action No. H-08-0337, 2008 WL

4155459, *4 (S.D. Tex., Sept. 2, 2008) ("The ACPA makes a person who in bad faith

seeks to profit from the goodwill associated with an owner's mark liable to the mark owner

for damages"); *Harrods Ltd. v. Sixty Internet Domain Names,* 110 F. Supp. 2d 420, 426

(E.D. Va. 2000) ("[T]he bill does not extend to innocent domain name registrations by

those who are unaware of another's use of the name, or even to someone who is aware of

the trademark status of the name but registers a domain name containing the mark for *any*

*reason other than with bad faith intent to profit from the goodwill associated with that*

*mark*") (quoting H.R. Conf. Rep. No. 106-464 (1999)) (emphasis added); *Id.* ("Under the

bill ... the abusive conduct that is made actionable is appropriately limited just to bad-faith

registrations and uses of others' marks by *persons who seek to profit unfairly from the*

*goodwill associated therewith*") (quoting S. Rep. No. 106-140) (emphasis added).

Nothing in the FAC meets the "plausibility standard" required by *Iqbal* for

establishing that the Moniker Defendants had a specific bad faith intent to profit from the

TRANSAMERICA marks.  Even if one accepts the allegations that Moniker is registering

domain names, and MPS is providing privacy services for Moniker's registrants, neither of

those allegations establish a specific bad faith intent to profit from the TRANSAMERICA

marks.  And, even if these actions constituted bad faith in a different context, they are

insufficient to show specific bad faith in the ACPA context.  *Sporty's Farms*, 202 F.3d 499,

n.13 ("We expressly note that 'bad faith intent to profit' are terms of art in the ACPA and

hence should not necessarily be equated with 'bad faith' in other contexts.").

Plaintiff must allege facts – not conclusions – which show that the Moniker

Defendants (i) registered (as a registrant), used or trafficked in an offending domain name

and (ii) that they did so with the specific bad faith intent to profit from the

TRANSAMERICA mark.  It has alleged no facts which would support either element of an

ACPA claim.  For that reason, the ACPA claim fails.

### 3.     The Claim for Contributory Cybersquatting Also Fails.

The FAC's sixth claim is for contributory cybersquatting.  Notably, it is unclear

whether such a claim even exists.  As the *Harrods* Court noted, the scope of the ACPA is

narrow.  *Harrods,* 110 F. Supp. 2d at 426 ("Our statutory interpretation is consistent with the

legislative history of the ACPA, which makes clear that the statute's scope is narrow.").

Given that the ACPA's scope is narrow, and the ACPA is specifically limited to those who

would register, use, or traffic in a domain name, the Court should proceed with caution

before permitting a cause of action which would, in essence, extend ACPA liability to

someone who does not fall within the statutory scheme of "registration, use, or trafficking."

Assuming, *arguendo*, that contributory cybersquatting is an actual cause of action,

the FAC falls woefully short of establishing contributory liability under the ACPA.  Because

the ACPA is contained within the Lanham Act, the same principles of contributory trademark

infringement apply.  Plaintiff must plead and prove that the Moniker Defendants induced the

infringement of the Transamerica marks or had knowledge of that infringement and had

direct control over the instrumentality of infringement.  The FAC pleads none of this.

Instead, the thrust of the allegations is that Moniker is passing along false registrant information in UDRP proceedings (FAC at ¶ 136),[3] and Moniker has the ability to "control and correct" the false information provided to the public by Moniker's customers (FAC at ¶ 139).  Even assuming these allegations to be true, neither establishes that Moniker is inducing its customers to infringe the TRANSAMERICA marks.  Neither allegation establishes that Moniker knew that its customers were infringing the TRANSAMERICA marks.  Neither allegation establishes that Moniker has direct control over the infringing instrumentality: the offending domain name, which belongs to the domain name registrant.

None of the elements for a contributory claim are present here, and, thus, this claim also fails as a matter of law.

### E.      THE UNFAIR COMPETITON AND FALSE ADVERTISEMENT CLAIMS ALSO FAIL.

The ninth claim for relief in the FAC is for common law unfair competition under Florida law.  "[A]n unfair competition claim based only upon an alleged trademark infringement is practically identical to an infringement claim."  *Tally-Ho, Inc. v. Coast Community College District,* 889 F.2d 1018, 1025-26 n.14 (11th Cir. 1990).  That being the case, Plaintiff's unfair competition claim fails for the same reasons that its infringement claims fail.

The eleventh claim is for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.204(1) which provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  However, the

---

[3] Obviously, if Moniker's customers are providing Moniker with false information, Moniker can only pass along that information in a UDRP proceeding.  Ironically, though, it does not matter what information Moniker provides because the UDRP moves forward regardless of what contact information Moniker provides.  Thus, no harm ever befalls the complainant.  If they have a legitimate claim, the domain name will be transferred, irrespective of whatever contact information Moniker provides.

FDUPTA only provides remedies for "consumer transactions" and has no application here where Transamerica was a not a consumer of the Moniker Defendants' services.  *See Thunder Marine, Inc. v. Brunswick Corp.*, 2007 WL 2302196, *8 n.7 (M.D. Fla. 2007) ("FDUPTA is a consumer protection law.  The statute defines a consumer as individuals, businesses, and other entities that purchase goods or services from sellers in the conduct of trade or commerce.. . .  [I]t is unclear that the transaction at issue here is related to a product or service purchased in connection with a consumer transaction between the parties.  Brunswick was neither the seller of the Marina nor the offeror of any good or service to Plaintiff in connection with the Marina); *Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla.2000) (granting motion to dismiss FDUPTA claim because it does not apply to dispute over funds borrowed by defendants; the lender plaintiff was not a "consumer" under the Act); *N.G.L. Travel Associates v. Celebrity Cruises, Inc.*, 764 So. 2d 672, 674 (Fla. 3d DCA 2000) (affirming dismissal with prejudice of claim by travel agent against cruise line for alleged deceptive practices in connection with bookings because travel agent was not a purchaser of goods or services); *LJS Co. v. Marks*, 480 F. Supp. 241, 244 (S.D. Fla. 1979) (FDUPTA did not apply, as a matter of law, to transaction involving the retention of a law firm by plaintiff corporation); *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 n.7 (11th Cir. 1994) (FDUPTA has no application in claim for trademark infringement); *Bryant Heating & Air Conditioning v. Carrier Corp.,* 597 F. Supp. 1045, 1053 (S.D. Fla. 1984) ("a private right of action for damages under the Act cannot be maintained unless the alleged unfair or deceptive acts or practices complained of involves a "consumer transaction"; . . .  Florida Courts have strictly construed the definition of "consumer transaction.").  Here, the FAC does not set forth a "consumer transaction" between Plaintiff and the Moniker Defendants, and, thus, this claim fails as a matter of law.  In addition,

FDUPTA expressly does not apply to an "act or practice . . . specifically permitted by federal . . . law."  Fla. Stat. § 501.212(1).  Thus, to the extent the ACPA recognizes registrar immunity, it is incorporated into FDUPTA as a complete defense.

The twelfth claim for relief in the FAC is for false advertising in violation of Fla. Stat. § 817.06 *et seq.*  However, to be liable under these provisions, the FAC would have to show that the Moniker Defendants intended to offer for sale or otherwise dispose of "merchandise, securities, certificates, diplomas, documents, or other credentials purporting to reflect proficiency in any trade, skill, profession, credits for academic achievement, service or anything offered by" the Moniker Defendants.  Fla. Stat. § 817.06.  No such allegation is made.  Indeed, the Moniker Defendants are not aware of any case applying the statute to a set of facts which center on trademark infringement.

## IV.        CONCLUSION

The First Amended Complaint attacks the actions taken by the registrants of various offending domain names.  However, it does not set forth a single viable cause of action against Moniker (the registrar), MPS (the privacy service provider), or Oversee (the parent company).  All causes of action should be dismissed as against the Moniker Defendants.

**DE LA O, MARKO,
MAGOLNICK & LEYTON**
Attorneys for the Moniker Defendants
3001 S.W. 3rd Avenue
Miami, Florida 33129
Telephone: (305) 285-2000
Facsimile:   (305) 285-5555

By:   /s/Miguel M. de la O
      **Miguel M. de la O**
      Florida Bar No. 0822700
      delao@dmmllaw.com
      **Joel S. Magolnick**
      Florida Bar No. 776068
      magolnick@dmmllaw.com

William A. Delgado, Esq.
California Bar No. 222666
**WILLENKEN WILSON LOH & LIEB LLP**
Co-counsel for the MonikerDefendants
707 Wilshire Blvd., Suite 3850
Los Angeles, California 90017
Telephone: (213) 955-9240
Facsimile:  (213) 955-9250
WDelgado@willenken.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 21, 2009, I served this Motion on all counsel of record and pro se parties identified on the attached Service List either via US Mail and E-mail.

Ava K. Doppelt, Esq.
Counsel for Defendant
Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
255 South Orange Avenue, Suite 1401
Post Office Box 3791
Orlando, Florida 32802-3791

Bruce A. McDonald, Esq.
Schnader, Harrison, Segal & Lewis, LLP
Of Counsel for Defendant
750 9th Street, N.W., Suite 550
Washington, D.C.  20001

Robert H. Thornburg, Esq.
Counsel for Defendant
Allen, Dyer, Doppelt, Milbrath & Gilchrist, P.A.
777 Brickell Avenue, Suite 1114
Miami, Florida  33131

 /s/  Miguel M. de la O
Miguel M. de la O