**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  09-60973-CIV-ALTONAGA/BROWN**

**TRANSAMERICA CORPORATION**,

       Plaintiff,

vs.

**MONIKER ONLINE SERVICES, LLC**;
**MONIKER PRIVACY SERVICES, INC.**;
**OVERSEE.NET**; and **JOHN DOES 1-10**
a/k/a "H.W. Barnes," "Domains Ventures,"
and "Domain Park Limited,"

       Defendants.

_____/

**ORDER**

This matter came before the Court upon Motion by Defendants, Moniker Online Services, LLC ("Moniker Online"); Moniker Privacy Service, LLC ("Moniker Privacy"); and Oversee.net ("Oversee") (collectively, "Defendants"), to Dismiss Plaintiff's Complaint ("Motion") [D.E. 32], filed on October 21, 2009.  The Court has carefully considered the parties' written submissions, oral arguments presented on November 6, 2009, and applicable law.

**I. BACKGROUND**[1]

This case involves the registration and use of internet domain names.  Plaintiff, Transamerica Corporation ("Transamerica"), is a holding company for a group of subsidiaries engaged in the sale of life insurance, investment planning, and retirement services.  (*See* Amended Complaint ("*Am. Compl.*") [D.E. 23] at ¶ 29).   Transamerica's largest subsidiary, Transamerica Life Insurance

---

[1] The allegations in Plaintiff's Amended Complaint are taken as true.

Case No. 09-60973-CIV-ALTONAGA/Brown

Company ("Transamerica Life"), has been underwriting insurance since 1906 and had more than

$1.1 trillion of insurance in force as of December 31, 2008. (*See id*. at ¶ 30). The Transamerica

Companies include, among others, Transamerica Capital, Inc., a wholesale marketing and sales

group that assists financial professionals in providing products to help investors; Transamerica

Financial Advisors, Inc., a full service broker/dealer; and Transamerica Investment Management,

LLC, a provider of investment management services. (*See id*. at ¶ 31).

The Transamerica Companies and their predecessors have used the name "Transamerica"

since 1929 as a trade name and service mark. (*See id*. at ¶ 33). Transamerica owns numerous

service mark registrations, with variations of the "Transamerica" theme, such as "Transamerica

Reinsurance," "Transamerica Classic," and "Transamerica Catalyst." (*See id*. at ¶ 34). The

Transamerica Companies have advertised and promoted "Transamerica" as a name and service mark

for many years in national consumer publications such as *Barrons*, *Businessweek*, *Forbes*, *Investor's

Business Daily*, *Kiplingers*, *Money*, *Newsweek*, *Sports Illustrated*, *Time*, *U.S. News & World Report*,

and *The Wall Street Journal*. (*See id*. at ¶ 36). Transamerica has also marketed itself in television

advertisements, print brochures, press releases, and point of sale pieces. (*See id*. at ¶¶ 37-38). The

Transamerica Companies spend millions of dollars every year to advertise and promote

"Transamerica" as a name and service mark. (*See id*. at ¶ 39). Plaintiff's "Transamerica" name is

advertised by the Transamerica Companies at multiple websites, including but not limited to

www.transamerica.com, www.timllc.com, www.transamericafunds.com,

www.transamericaseriestrust.com, www.ta-retirement.com, and www.transamericaworksite.com.

2

Case No. 09-60973-CIV-ALTONAGA/Brown

(*See id*. at ¶ 40).  Plaintiff actively enforces its rights in the "Transamerica" service mark, particularly where the name is used in connection with consumer fraud.  (*See id*. at ¶ 43).

Defendant, Moniker Online, is a limited liability company located in Pompano Beach, Florida.  (*See id*. at ¶ 11).  Defendant, Moniker Privacy, is a Delaware limited liability company.  (*See id*. at ¶ 12).  Defendant, Oversee.net, is a California corporation located in Los Angeles, California.  (*See id*. at ¶ 13).  Transamerica alleges that Oversee owns and controls the Moniker Defendants, acts in concert with them, and shares in the profits earned from infringing activities by domain name owners and the Moniker Defendants.  (*See id*. at ¶ 14).

Moniker Online is accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN"), to register internet domain names on behalf of third parties.  (*See id*. at ¶ 49).  ICANN was created by Congress in 1998 to administer the domain name system.  (*See id*. at ¶ 44).  To engage in domain name registration, a registrar is required to enter into agreements with ICANN that obligate the registrar to ensure accurate and current data in the "Whois" database, which provides information about domain name owners to enable members of the public to contact the domain name owners about technical and legal issues related to those domain names.  (*See id*. at ¶¶ 46, 48).  Transamerica alleges that Moniker has violated its agreement with ICANN by enabling a class of customers composed of fictitious entities to monetize[2] counterfeit domain names, acting as their authorized licensee and/or otherwise in concert with them, profiting with them jointly in the

---

[2] The term "monetize" generally means to establish something as legal tender.  *See* Merriam Webster's Collegiate Dictionary 801 (11th ed. 2005).  The monetization of a domain name refers to populating a domain name with hyperlinks to other advertisers, and obtaining a fee from those advertisers each time a user clicks onto the hyperlink.  (*See* Transcript of November 6, 2009 Hearing ("*Hearing*") at 12-13).

Case No. 09-60973-CIV-ALTONAGA/Brown

process.  (*See id*. at ¶ 50).  Transamerica also alleges that Moniker conceals the identity of the domain name owners by registering those owners in the "Whois" database with Moniker Privacy Services.  (*See id*. at ¶¶ 50-51).  By registering with Moniker Privacy, a domain name owner's contact information cannot be found by the general public, such that the origin and source of goods and services advertised on that domain name are unknown.  (*See id*. at ¶ 55).  Transamerica additionally claims that Moniker intentionally or recklessly supplies registration services to fictitious entities, knowing that these entities engage in trademark and service mark counterfeiting.  (*See id*. at ¶ 50).

Moniker registered numerous domain names that are substantially similar to "Transamerica" and Transamerica's registered marks.  These include, but are not limited to:

- TRANSAMERICALIFEINS.COM

- ONTRANSAMERICALIFEINSURANCE.COM

- TRANSAMERICAANNUITY.COM

- TRANSAMERICAOCCIDENTAL.COM

- TRANSAMERICASERVICES.COM

- TRANSAMERICASERVICE.COM

- TRANSAMERICANSERVICES.COM

- TRANSAMERICAHITS.NET

- TRANSAMERICACREDITREPORT.COM

- TRANSAMERICANINDEX.COM

- TRANSAMERICA.COM

Case No. 09-60973-CIV-ALTONAGA/Brown

(*See id*. at ¶ 61).  The registrants of these domain names include Moniker Privacy Services, Domains Ventures, Virtual Sky, and Net 41Media, among others.  (*See id*.).

In 1999, ICANN established a quasi-arbitration procedure called the Uniform Dispute Resolution Policy (UDRP) to provide for the recovery of infringing internet domain names by trademark and service mark owners.  (*See id*. at ¶ 52).  A UDRP complaint may be instituted against the individual or entity identified as the "registrant" of the domain name in question.  (*See id*. at ¶ 53).  The UDRP does not provide for damages or injunctive relief, but merely orders the transfer of an infringing domain name from the current registrant.  (*See id*. at ¶¶ 54, 62).  One registrant, Domains Ventures, was required to transfer various infringing domain names under UDRP decisions at least 35 times between 2004 and 2009.  (*See id*. at ¶ 62).  These domain names included, for example: fisherpricetoys.com, techron.com, aarppharmacyservices.com, and prudental.com.  (*See id*.).

One of the domain names alleged to be infringing is "Transamericalifeins.com."  (*See id*. at ¶ 63).  The website for Transamericalifeins.com displays two depictions of the "Transamerica" service mark, "Transamerica Life Ins. Co." (*See id*.).  If a consumer clicks on the "Transamerica Life Ins. Co." link, he or she will be transferred to a site titled "Transamerica Life Ins Co," but which is not affiliated with Plaintiff, Transamerica.  (*See id*. at ¶ 64).  From there, a consumer may go to yet another site through the link "Transamerica My-Life-Insured.com."  (*See id*.).  The domain name "My-Life-Insured.com" was registered as of June 2009 to an entity named "My Life Insured," with an address listed as 655 4th St., San Francisco, California.  (*See id.* at ¶ 65).  Upon investigation,

Case No. 09-60973-CIV-ALTONAGA/Brown

however, that address houses an automobile glass replacement company and has no occupant named "My Life Insured." (*See id*.).

Transamerica alleges that the scheme described above involves Moniker acting in concert with fictitious entities or anonymous individuals, using the Transamerica service mark to channel internet traffic familiar with the Transamerica name into websites belonging to third parties engaged in the advertising and sale of life insurance and financial services. (*See id*.). According to Transamerica, the scheme involving Transamericalifeins.com is but one of many in which consumers are duped into believing they are accessing the well-known Transamerica, but instead are directed to other entities selling comparable products. (*See id*. at ¶¶ 71-85). The ostensible owners of the infringing domain names are anonymous individuals or fictitious entities who are impossible to locate. (*See id*.).

Transamerica filed suit against Moniker Online, Moniker Privacy, Oversee and several "John Doe" Defendants, the ostensible domain name registrants. (*See id*.). Transamerica asserts numerous claims against the Defendants: Count I, Federal Service Mark Counterfeiting under the Lanham Act, 15 U.S.C. § 1114 *et seq*., by all Defendants; Count II, Contributory Service Mark Counterfeiting under the Lanham Act by the Moniker Defendants; Count III, Federal Service Mark Infringement under the Lanham Act by all Defendants; Count IV, Contributory Service Mark Infringement under the Lanham Act by the Moniker Defendants; Count V, Cybersquatting under the Anticybersquatting Consumer Protection Act ("ACPA"), Pub. L. No. 106-113, 113 Stat. 1501 and the Lanham Act, 15 U.S.C. § 1125 (d) by all Defendants; Count VI, Contributory Cybersquatting under the ACPA by the Moniker Defendants; Count VII, Federal Unfair Competition, False Representation and False

Case No. 09-60973-CIV-ALTONAGA/Brown

Designation of Origin under the Lanham Act by all Defendants; Count VIII, Federal Dilution under the Lanham Act by all Defendants;  Count IX, Common Law Unfair Competition by all Defendants; Count X, Florida Dilution under Florida Statute § 495.151 by all Defendants; Count XI, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204(1); and Count XII, Florida Statutory False Advertising, Fla. Stat. § 817.06 and §§ 817.40 - 47 by all Defendants.  (*See id.*).   Transamerica seeks injunctive relief and monetary damages against all Defendants.  (*See id.*).  Defendants, Moniker Online, Moniker Privacy, and Oversee move to dismiss all counts of Transamerica's Amended Complaint.

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555)).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 129 S. Ct. at 1950 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is

Case No. 09-60973-CIV-ALTONAGA/Brown

insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, No. 06-15851, 2009 WL 2431463, at *4 (11th Cir. Aug. 11, 2009) (citing *Iqbal*, 129 S. Ct. at 1949).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). But pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950; *see also Sinaltrainal*, 2009 WL 2431463, at *3 ("'[U]nwarranted deductions of fact' in a complaint are not admitted as true for purposes of testing the sufficiency of the allegations."). A court's analysis of a Rule 12(b)(6) motion "is limited primarily to the face of the complaint and the attachments thereto." *Brooks*, 116 F.3d at 1368.

### III.  ANALYSIS

Defendants move to dismiss Transamerica's Amended Complaint on several grounds, each of which is addressed in turn.

### A.      All Counts:  General Failure to Allege Facts

Defendants first appear to argue that Transamerica has failed to plead sufficient facts to survive a motion to dismiss. However, in this section of their Motion to Dismiss, Defendants merely set forth the legal standard to review a motion to dismiss, citing *Twombly*, 550 U.S. 544, and *Iqbal*, 129 S. Ct. 1937. Defendants do not point to any specific counts in Transamerica's Amended Complaint that fail to allege specific facts, or which are merely formulaic recitations of the elements of a cause of action. Thus, the Court gives this argument no further consideration.

8

Case No. 09-60973-CIV-ALTONAGA/Brown

**B.      Counts I, III, VII, VIII and X:  Failure to Plead "Use in Commerce"**

Defendants next argue that several of Transamerica's claims are subject to dismissal because Transamerica fails to allege that Moniker "used" the counterfeit mark "in commerce" in connection with the sale, distribution or advertising of any goods or services.  (*See* Defendants' Motion to Dismiss ("*Defendants' Mot.*") [D.E. 32] at 4).  According to Defendants, Transamerica's failure to plead "use in commerce" defeats its claims for direct federal service mark counterfeiting (Count I), direct federal service mark infringement (Count III), false designation of origin (Count VII), and both the federal and Florida dilution of service mark claims (Counts VIII and X).  (*See Defendants' Mot.* at 4-5).[3]

Under the Lanham Act,

(1) Any person who shall, without the consent of the registrant –

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in

---

[3] To succeed in an infringement or counterfeiting claim, a plaintiff must establish: "(1) that [it] possess[es] a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred 'in commerce,' (4) that the defendants used the mark 'in connection with the sale . . . or advertising of any goods,' and (5) that the defendants used the mark in a manner likely to confuse consumers." *North American Medical Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008) (citations omitted, alterations added); 15 U.S.C. § 1114(1)(a).  Defendants address only the third element; they argue the claims fail for failure to plead use in commerce.  Similarly, Defendants do not assert that Transamerica has failed to plead the other requisite elements of its claims for false designation of origin or dilution.

9

Case No. 09-60973-CIV-ALTONAGA/Brown

> connection with the sale, offering for sale, distribution, or advertising
> of goods or services on or in connection with which such use is likely
> to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.
. . .

15 U.S.C. § 1114(1)(a). The Eleventh Circuit has explained that "[t]he first step of a trademark infringement action is to demonstrate an unauthorized 'use' of the plaintiff's mark in commerce." *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1242 (11th Cir. 2007) (citation omitted).

Defendants claim that "[a]s a registrar, Moniker simply registers a domain name with ICANN on behalf of a third party; its role ends there." (*Defendants' Mot*. at 4). In support of this position, Defendants cite *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002). In *Bird*, the court found a domain name registrar was not liable for the infringement caused by the domain name owner because the registrar did not use the mark in commerce. The court reasoned,

> A registrar that grants a particular domain name to a registrant simply grants it an
> address. . . . The fact that the registrant can then use its domain name to infringe on
> the rights of a registered trademark owner does not subject the registrar to liability
> for trademark infringement or unfair competition.

*Id*. at 878.

Defendants also cite *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949 (C.D. Cal. 1997), where the court reached a similar result regarding registrar liability. The court held that the registrar "merely uses domain names to designate host computers on the Internet. This is the type of purely 'nominative' function that is not prohibited by trademark law." *Id*. at 957 (citations omitted). According to Defendants, Moniker cannot be liable for infringement or

10

Case No. 09-60973-CIV-ALTONAGA/Brown

counterfeiting, because it performs a merely nominative function, and does not actually "use" the marks.

According to Transamerica, Defendants' argument "flies in the fact of recent court decisions." (Plaintiff's Response to Motion to Dismiss ("*Plaintiff's Resp.*") [D.E. 42] at 3). For example, in *North American Medical Corp.*, the U.S. Court of Appeals for the Eleventh Circuit recently held that the "use in commerce" prong of an infringement claim was satisfied where a company used a competitor's trademark in a "meta tag" in its website.[4] 522 F.3d 1211. The court rejected the defendant's argument that because internet users did not actually see the trademarked terms on its website, the use of the trademarks in a meta tag did not constitute a "use" under the Lanham Act. *Id.* at 1218-20. The court readily concluded that the defendant's use of the trademarks in a meta tag, which drew consumers to its website to promote its product, constituted a "use" as contemplated by the Lanham Act. *Id.* at 1219. While not identical to the facts alleged here, *Axiom* stands for the broader proposition that where a trademark is used on the internet so as to draw consumers to a particular website, the use in commerce prong of a Lanham Act claim is satisfied.

Closely on point to this case is *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 760 (N.D. Ill. 2008). In *Vulcan Golf*, the plaintiffs made allegations similar to those raised here. Specifically, the plaintiffs alleged

> [C]ertain of the defendants register, license and/or "park,"[2] among other things, domain names that are the same as or substantially and confusingly similar to the plaintiffs' distinctive trade names or marks.[3] The defendants do this because they

---

[4] As the court explained in *Axiom*, meta tags are words and phrases embedded within a website's computer code, which will cause key word searches to direct a user to that particular website. 522 F.3d at 1217 n.2.

11

know that when an internet user types a domain name into the address bar on the Google web browser, there is a possibility that the user will either guess the domain name for the plaintiff (and guess wrong) or misspell the name he or she is looking for.

> [2] The FAC [First Amended Complaint] identifies defendants Ireit, Oversee, Sedo, Dotster and unnamed conspirators as the "Parking Company" defendants. FAC ¶ 78. According to the FAC, a "parking company" is a company that "aggregates numerous domain names from individual domain registrants and contracts with an advertising service [here, Google] to license and monetize those domain names." *Id*. at ¶ 83(w). The FAC further defines "monetization" as "the practice of using a domain name for commercial gain by generating revenue from Internet advertising located on a webpage." *Id.* at 83(u).

> [3] For more in-depth explanations of internet searches and the domain name system, *see Bird v. Parsons*, 289 F.3d 865, 869-70 (6th Cir. 2002); *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 951-53 (C.D. Cal. 1997).

*Id*. at 759-760 (some alterations added).

The plaintiffs further alleged that the parking companies collaborated with the search engine provider to guide users to other sites using names similar to the plaintiffs' protected trademarks. *Id*. The court found plaintiffs had properly pled the use in commerce requirement for a claim of trademark infringement under the Lanham Act, as well as adequately stated a claim for trafficking in domain names under the Anticybersquatting Consumer Protection Act ("ACPA") 15 U.S.C. § 1125(d). *Vulcan Golf*, along with other recent cases to address the issue,[5] clarify that the use of a

---

[5] Transamerica points to several additional recent decisions in which courts have come to similar conclusions. *See, e.g., Rescuecom Corp. v. Google, Inc*., 562 F.3d 123, 130 (2d Cir. 2008) (holding that use of trademarks as keywords constitutes use in commerce); *Hearts on Fire Co., LLC v. Blue Nile, Inc*., 603 F. Supp. 2d 274, 282 (D. Mass. 2009) (finding the purchase of trademarks to trigger pop-up or banner advertisements is use in commerce); *Hysitron, Inc. v. MTS Systems Corp*., No. 07-01533, 2008 WL 3161969 (D. Minn. Aug. 1, 2008) (holding, and noting that the majority of courts have found the use of a competitor's trademark to create a sponsored link or other advertising constitutes use in commerce).

Case No. 09-60973-CIV-ALTONAGA/Brown

trademark to draw consumers to a particular website not belonging to the trademark holder constitutes use in commerce under the Lanham Act.[6]

Here, Transamerica alleges that Moniker Online, Moniker Privacy, and Oversee, together with the various John Doe defendants, register domain names similar to Transamerica (among many other well-known, trademark-protected names), monetize those domain names by steering consumers to other websites, and share in the profits generated by these monetized domain names. Defendants argue that Moniker Online merely registers the domain name, and any "use" is undertaken only by the registrant. Defendants' argument – their version of their own activities  –  is irrelevant for purposes of this Motion. The Amended Complaint alleges much more involvement on the part of Moniker. Transamerica alleges that Moniker does not simply register a domain name and then go about its business. Instead, Moniker Online allegedly works with the registrant – generally a fictitious entity – along with Oversee and Moniker Privacy, in order to profit from the infringing use of the trademarks.[7]

---

[6] At oral argument, a distinction was drawn between use of a trademark to draw consumers to another website competing with the trademark holder, or to draw users for other, legal purposes. For example, an individual could have the domain name "disney.com" and rather than compete with Disney, provide reviews and commentary about all things Disney on the site. Transamerica's Amended Complaint alleges that Defendants draw consumers to other websites that compete with Transamerica for insurance and financial planning services.

[7] Defendants briefly argue that Transamerica has failed to include any allegation that Oversee, the parent company, uses a mark in commerce. This argument, too, fails to persuade. The Amended Complaint sufficiently alleges Oversee's involvement in the monetization scheme to satisfy the use in commerce prong as to Oversee as well as the Moniker Defendants. Among other things, the Amended Complaint alleges that "Oversee.net owns and controls Moniker, acts in concert with Moniker for all purposes relevant to this Complaint, shares in the profits earned from 'monetization' of domain names by Moniker, and has been unjustly enriched by the unlawful conduct of Moniker and the John Doe Defendants." (*Am. Compl.* at ¶ 14).

13

Case No. 09-60973-CIV-ALTONAGA/Brown

Defendants' argument that Transamerica has not established the "use in commerce" requirement is unavailing.  Counts I, III, VII, VIII and X will not be dismissed on that basis.

### C.    Counts II and IV: Failure to Plead Inducement, Knowledge, and Control

"To be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied."  *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)).   When the primary infringer supplies a service rather than a product, a court must, under the second prong, "'consider the extent of control exercised by the defendant over the third party's means of infringement.'"  *Id.* (quoting *Lockheed Martin Corp. v. Network Solutions Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).  The U.S. Court of Appeals for the Eleventh Circuit has explained that "any liability for contributory infringement will necessarily depend upon whether or not the contributing party intended to participate in the infringement or actually knew about the infringing activities."  *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992) (citations omitted).

Defendants maintain that Transamerica's claims for contributory counterfeiting and infringement fail because Transamerica fails to plead either inducement or knowledge and control.  (*See Defendants' Mot.* at 6).  As to the inducement prong, Defendants state: "[h]ere, there is no allegation that the Moniker Defendants intentionally induced its [sic] customers to infringe the Transamerica marks." (*Id.* at 7)  Regarding the knowledge and control prong, Defendants claim the Amended Complaint "does not allege that (i) Moniker had specific knowledge of infringement or

14

Case No. 09-60973-CIV-ALTONAGA/Brown

(ii) that it had direct control over the infringing instrumentality." (*Id.*).  These assertions are

contradicted by the explicit allegations of the Amended Complaint.

> The Amended Complaint alleges that Defendants' conduct includes:
>
> enabling a class of customers comprised of fictitious entities and anonymous individuals to "monetize" counterfeit domain names, acting as their authorized licensee and/or otherwise in concert with them, profiting with them jointly in the process, concealing their identity when challenged, and intentionally or recklessly continuing to supply registration services to them with knowledge that they are fictitious entities engaged in trademark and service mark counterfeiting, or with willful blindness to that fact.

(*Am. Compl.* at ¶ 50).  The Amended Complaint further alleges that:

> The UDRP cases listed in Exhibit B to this Complaint, without more, show that Moniker has continued to register counterfeit domains to "Domains Ventures" of Xiamen, China, ostensible owner of TRANSAMERICASERVICE.COM and TRANSAMERICASERVICES.COM during the relevant period, long after it would have been apparent to any registrar in Moniker's position that its customer was using Moniker's services to engage in trademark and service mark counterfeiting, and long after Moniker knew or should have known that its customer was a fictitious entity and/or anonymous individual.  As seen in Exhibit B, Moniker was ordered to transfer domain name registrations ostensibly owned by "Domains Ventures" (and/or its apparent alias, "Domain Asia Ventures" ostensibly located at an adjacent address in Xiamen, China), in the following UDRP cases decided by one arbitration service provider: . . . .

(*Id.* at ¶ 62).

Defendants claim that Transamerica does not and cannot show that Defendants induced,

knew and controlled the John Doe Defendant/registrants, because Moniker had no knowledge or

control.  Such a discussion goes to matters of proof, not to the necessary elements of the claims.  To

survive a motion to dismiss, Transamerica need only allege the elements with a sufficient factual

basis such that the claims are plausible.  *Iqbal*, 129 S. Ct. 1937; *Twombly*, 550 U.S. 544.  The

15

Case No. 09-60973-CIV-ALTONAGA/Brown

allegations as stated in the Amended Complaint are sufficient to state a claim for contributory

counterfeiting and infringement.

### D.    Counts V and VI: Registrar Immunity and Lack of Bad Faith

The ACPA defines "cybersquatting" as "the (1) registration, use, or trafficking in, a domain

name (2) that is identical or confusingly similar to a distinctive or famous trademark, (3) with a

bad-faith intent to profit from the mark." *Dell Inc. v. BelgiumDomains, LLC*, No. 07-22674-CIV,

2007 WL 6862342, at \*5 (S.D. Fla. Nov. 21, 2007) (citing 15 U.S.C. § 1125(d)).  The ACPA also

provides that "[a] person shall be liable for using a domain name under subparagraph (A) only if that

person is the domain name registrant or that registrant's authorized licensee."   15 U.S.C. §

1125(d)(1)(D).

Defendants argue that because they are neither the registrants nor the registrants' official

licensees, they are immune from liability under the ACPA as a matter of law.  (*See Defendants' Mot*.

at 10).  According to Defendants, "[t]ime and again, courts that have examined the ACPA have ruled

that registrars such as Moniker cannot be liable under the ACPA."  (*Id*.).  Defendants cite what they

call the "leading decision in this realm"  – *Lockheed Martin Company v. Network Solutions, Inc*.,

141 F. Supp. 2d 648 (N.D. Tex. 2001) (*Lockheed II*)  – in support of this position.  (*See id*.).  In

*Lockheed II*, the court stated:

> Having studied the language of § 1125(d) in the light of the summary judgment
> record, the court cannot conclude that it creates a cause of action against defendant
> as a domain name registrar or registry.  There is no summary judgment evidence that
> plaintiff is a person who has had a "bad faith intent to profit from" specific marks,
> 15 U.S.C. 1125(d)(1)(A)(i), that are registered with it or contained in its registry.
> That the court's interpretation of "intent to profit from that mark" is correct is
> supported by § 1125(d)(1)(B)(i), which lists factors the court may consider in
> determining whether a person has a bad faith intent.  Although the list is not

16

Case No. 09-60973-CIV-ALTONAGA/Brown

exclusive, none of the conditions and conduct listed would be applicable to a person functioning solely as a registrar or registry of domain names.

*Id*. at 654-55.  The court further explained:

It is quite understandable that Congress did not cause defendant as a domain name registrar, or as keeper of the registry, to be subject to civil liability under § 1125(d).  Although plaintiff now tries to backtrack somewhat from the position that defendant as registrar should perform gatekeeper functions for mark owners, even the modified gatekeeper role it now proposes is untenable.  Sheer volume alone would prohibit defendant performing the role plaintiff would assign.  Defendant simply could not function as a registrar, or as keeper of the registry, if it had to become entangled in, and bear the expense of, disputes regarding the right of a registrant to use a particular domain name.  The fact that defendant could theoretically do what plaintiff asks does not mean that defendant is obligated to do so at the risk of financial ruin.  The reason the UDRP was developed was to provide the mechanism to resolve these disputes.  Not only would imposing plaintiff's scheme render the UDRP nugatory, it would cause the domain name registration system in its entirety not to be feasible.

*Id*. at 655.  According to Defendants, the clear language of the ACPA and the *Lockheed II* ruling preclude Transamerica from seeking to impose liability upon Oversee and the Moniker Defendants for cybersquatting.

Recent cases hold differently.[8]  In *Dell*, the court held that the qualified immunity for registrars under the ACPA does not apply when the registrar is also the registrant:

Because Defendants are both the registrant and registrar, Defendants do not qualify for the "safe harbor" provision of the ACPA that exempts domain name registrars from liability "for injunctive or monetary relief . . . except in the case of bad faith or reckless disregard, which includes a willful failure to comply with any such court order." 15 U.S.C. § 1125(d)(2)(D)(ii).  Moreover, even if Defendants were

_____

[8] Defendants attempt to distinguish these adverse cases in their Reply, claiming that Transamerica has not adequately pled that Defendants are the actual registrants of the domain names.  (*See* Defendants' Reply Memorandum ("*Defendants' Reply*") [D.E. 44] at 7-8).  This attempt to distinguish fails, however, because Transamerica has pled that Defendants' involvement in the monetization and profit of the domain names renders them *de facto* registrants.

just the registrar, they would not qualify for this exemption because they have acted in "bad faith" and with "reckless disregard" of known trademark rights of Plaintiffs and countless other trademark owners.

2007 WL 6862342 at *10.  Similarly, in *Solid Host, NL v. Namecheap, Inc.*, No. CV 08-5414 MMM, 2009 WL 2225726 (C.D. Cal. May 19, 2009), the court rejected defendant's immunity claim under the ACPA.  The court noted that while the *Lockheed II* court held that a registrar was not liable under the ACPA, that immunity applied only when the registrar was acting as a registrar.  *Id*. at *9.  The court went on to note that "[n]othing in *Lockheed Martin II*, however, suggests that a registrar is immune under the ACPA when it acts other than as a registrar.  Indeed, to the extent that NameCheap was the registrant of the domain name and 'used' the name, this section would support the imposition of liability on it, not a grant of immunity to it."  *Id*.

In *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 914 (N.D. Ill. 2007), the court denied defendants' motion to dismiss based on immunity where plaintiffs alleged that several defendants, as a group, had registered the domain names at issue.  The court reasoned:

> Even if there were no allegations that Kathrein registered the website, Plaintiffs have made allegations that Kathrein has engaged in a violation of the ACPA as the alter ego of Lee, as discussed above.  (D.E. 15 ¶ 4.)  A plaintiff can pursue a trademark infringement claim under a veil-piercing theory, *Bally Schuhfabriken AG v. Bally Manufacturing Corp.*, No. 92 C 0312, 1992 WL 80554, at *2 (N.D. Ill., Apr. 8, 1992) (collecting authority), and Plaintiffs can presumably do the same with an ACPA claim, since both trademark infringement and ACPA claims are advanced under the Lanham Act. The ACPA does contain a specific provision (that does not apply to the Lanham Act generally) stating that "[a] person shall be liable for using a domain name . . . only if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D).  However, if Kathrein is deemed to be the alter ego of Lee or Lee Street, Kathrein seemingly would be deemed the "registrant" under the statute, since "the separate personalit[y]" of

Case No. 09-60973-CIV-ALTONAGA/Brown

> Kathrein would "no longer exist." *Sea-Land Servs*., 993 F.2d at 1311.[9]  Therefore,
> based on the allegations in the Complaint, Kathrein seemingly could be considered
> the "domain name registrant or that registrant's authorized licensee."  15 U.S.C. §
> 1125(d)(1)(D).

*Id*. at 914-15.

Finally in *Hamptons Locations, Inc. v. Rubens*, No. 01CV5477DRHWDW, 2005 WL
2436209 (E.D.N.Y. Sept. 30, 2005), the court denied defendants' motion for summary judgment in
a cybersquatting case where the plaintiff alleged that one defendant was the *de facto* registrant of an
infringing domain name.  *Id*. at *8.  The court stated that

> Although the evidence linking Darrell to DSNY is marginal at best, the Court cannot
> state as a matter of law that no reasonable trier of fact could conclude that Darrell
> was sufficiently linked to DSNY so as subject him to liability under the ACPA.  He
> was clearly involved in the development, launching, and operation of the website and
> he himself testified that he went to "Network Solutions" with his friends to see what
> domain names were available. (Darrell Aff. ¶ 7 .) Thereafter, Darrell and his friends
> chose *www.hamptonlocations.com* and "one of [his] friends" purchased the domain
> name through DSNY.  (*Id*. at ¶ 8).  Although the Court is dismayed, to say the least,
> at Plaintiffs' failure to elicit evidence as to the identity of DSNY and Darrell's
> relationship therewith, based on the evidence the Court does have, the Court is
> constrained to conclude that a reasonable trier of fact could circumstantially infer that
> Darrell was DSNY's "authorized licensee."

*Id*.

In this case, Transamerica alleges that Oversee and the Moniker Defendants, together with
the ostensible registrants – the John Doe Defendants – are the *de facto* registrants of the domain
names in question.  Transamerica claims that Moniker was not merely acting as a registrant in
providing registration services to the John Doe Defendants for the infringing domain names, but
instead was part of a scheme to profit from the use of the infringing names.  As Transamerica points

---

[9] *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309 (7th Cir. 1993).

Case No. 09-60973-CIV-ALTONAGA/Brown

out, Moniker receives a fee each time an internet user clicks on one of the links attached to the infringing domain sites; such payment establishes at least partial ownership in the domain name. (*See Hearing* 63, 67). Transamerica's Amended Complaint alleges that Moniker Online provides registration services, Moniker Privacy protects the identity of the ostensible registrant, and Oversee provides the monetization service to the domain name. (*See id*. at 65). Together, these three Defendants are part of a scheme by which they profit from the misuse of others' trade and service marks. (*See id*.). These allegations, taken as true as they must be on a Rule 12(b)(6) motion, satisfy the requirement that Defendants be acting as more than registrars so as to strip them of immunity under the ACPA.[10]

Finally, Defendants argue that Transamerica has failed to show the "bad faith" required to impose liability under the ACPA. The ACPA provides that "[a] domain name registrar, a domain name registry, or other domain name registration authority shall not be liable for damages under this section for the registration or maintenance of a domain name for another absent a showing of bad faith intent to profit from such registration or maintenance of the domain name." 15 U.S.C. § 1114(2)(D)(iii). The Lanham Act's subsection on "cyberpiracy prevention" also has a bad faith

---

[10] Defendants argue that because Transamerica was "[u]ndoubtedly cognizant of the fact that Moniker cannot be held liable as a registrar under the ACPA," Transamerica attempted another means by which to impose cybersquatting liability against Defendants. (*Defendants' Mot*. at 11). Defendants claim that Transamerica's allegations that Defendants have "registered, used, or trafficked in domain names with the bad faith intent to profit from the goodwill associated with the Transamerica marks" should be rejected as mere legal conclusions. (*Id*.). Because Transamerica's allegations that the Defendants are the *de facto* registrants of the domain names is sufficient to establish cybersquatting liability, there is no need to address whether any alternative means of imposing liability under the ACPA are viable.

20

Case No. 09-60973-CIV-ALTONAGA/Brown

provision that states a person will be liable to the owner of the mark when that person "has a bad faith intent to profit from that mark." 15 U.S.C. §1125(d)(1)(A)(i).[11]

Relying on the latter provision, Defendants assert that "[t]he bad faith required to support a cybersquatting claim is not general bad faith, but 'a bad faith intent to profit from the mark.'" (*Defendants' Mot*. at 13) (citing 15 U.S.C. § 1125(d)(1)(A)(I)). Defendants claim that Transamerica has failed to plead that Moniker had a bad faith intent to profit specifically from the Transamerica mark, as opposed to other marks in general. (*See id*.).

It is true that Transamerica's Amended Complaint discusses Defendants' history as it applies to various trademarks of other entities. In numerous cases, registrants who registered their domain names with Moniker were the subject of UDRP complaints, with the result that the registrant was forced to stop using the domain name, as it was found that the domain name was infringing upon a protected trade or service mark. In spite of these complaints, however, Moniker continued to register domain names substantially similar to well-known trade names to the same John Doe Defendants. Transamerica claims these actions compel the inference that the Defendants knew or recklessly disregarded the fact that the registrants were misusing domain names. With this history as background, the Amended Complaint identifies eleven separate domain names registered by Moniker that are substantially similar to the Transamerica mark. (*See Am. Compl*. at ¶ 61). These factual allegations are sufficient at the pleading stage to satisfy the bad faith prong by creating an inference

---

[11] Because Transamerica alleges that Defendants were not merely registrars but registrants, bad faith is not required to state a claim under the ACPA. Nonetheless, Transamerica sufficiently alleges bad faith on the part of Defendants to establish their liability even as mere registrars and for liability to attach under the Lanham Act's cyberpiracy provisions.

Case No. 09-60973-CIV-ALTONAGA/Brown

that Defendants intended to profit from the misuse of Transamerica marks as well as the marks of others.[12]

### E.    Counts IX, XI, and XII: Unfair Competition, FDUTPA Violation, and False Advertising Claims

#### 1.    Florida Unfair Competition Claim

Defendants argue that Transamerica's claim for unfair competition under Florida law fails because "an unfair competition claim based only upon an alleged trademark infringement is practically identical to an infringement claim." (*Defendants' Mot*. at 16) (quoting *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1025-26 n.14 (11th Cir. 1990). Defendants then assert that "[t]hat being the case, Plaintiff's unfair competition claim fails for the same reason that its infringement claims fail." (*Id*.). Because Transamerica's infringement claims survive a Rule 12(b)(6) motion, the Florida unfair competition claim also survives.

#### 2.    The FDUTPA Claim

Defendants contend that Transamerica's FDUTPA claim fails because the FDUTPA applies only to "consumer transactions." (*See Defendants' Mot*. at 17). Citing numerous cases decided before 2001, Defendants maintain that because Transamerica is not a consumer of the Defendants' services, Transamerica cannot state a claim against Defendants under the FDUTPA.

---

[12] Defendants argue that Transamerica's claim for contributory cybersquatting fails for the same reasons its claims for contributory counterfeiting and contributory infringement fail. The latter claims survived dismissal, and the same reasoning applies to the contributory cybersquatting claim. Transamerica has pled sufficient inducement, knowledge, and control by the John Doe Defendants to state a claim for contributory cybersquatting.

Case No. 09-60973-CIV-ALTONAGA/Brown

Prior to its amendment in 2001, the FDUTPA did restrict actions under the statute to those brought by consumers, reading, "[i]n any individual action brought by a *consumer* who has suffered a loss as a result of a violation of this part, such *consumer* may recover actual damages, plus attorney's fees and court costs." *Furmanite America, Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145-46 (M.D. Fla. 2007) (emphasis in original) (quoting § 501.211(2), Fla. Stat.). However, in 2001, the statute was amended, and the word "consumer" was replaced with "person." *Id.* Courts interpreting the amendment agree that the change represents a clear legislative intent to allow a broader base of complainants, such that any person aggrieved by a violation of the statute may bring a claim under the FDUTPA. *Id.* at 1146.

Defendants further argue that the FDUTPA "expressly does not apply to an 'act or practice . . . specifically permitted by federal . . . law.' Fla. Stat. § 501.212(1). Thus, to the extent the ACPA recognizes registrar immunity, it is incorporated into FDUTPA as a complete defense." (*Defendants' Mot.* at 18) (ellipses in original). As noted, immunity under the ACPA applies only to registrars when they are acting solely in their capacity as registrars. Because Transamerica alleges the Defendants are acting as registrants as well as registrars, the immunity does not apply under the ACPA, nor does it bar Transamerica's claim under the FDUTPA.

### 3. False Advertising

Finally, Defendants argue that Transamerica's claim of false advertising under Florida Statute Section 817.06 fails. Defendants maintain that in order to state a claim under section 817.06, Transamerica would have to show that "the Moniker Defendants intended to offer for sale or otherwise dispose of 'merchandise, securities, certificates, diplomas, documents, or other credentials

23

Case No. 09-60973-CIV-ALTONAGA/Brown

purporting to reflect proficiency in any trade, skill, profession, credits for academic achievement, service or anything offered by' the Moniker Defendants." (*Defendants' Mot*. at 18) (quoting Fla. Stat. § 817.06).

As a threshold matter, Transamerica's claim for false and misleading advertising is brought under section 817.06, as well as sections 817.40 - 817.47. Sections 817.40 - 817.47 are not as limited as section 817.06. Section 817.41, titled "Misleading advertising prohibited," provides, in relevant part, that

> It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pretenses.

Transamerica alleges that Defendants have used the well-known Transamerica mark to lead consumers to websites offering life insurance, financial services, and other services similar to those offered by Transamerica. Transamerica further alleges that consumers believe they are accessing Transamerica products and services when in fact, they are not. These allegations are sufficient to fall within the ambit of Florida's false and misleading advertising statutes.

## VI. CONCLUSION

In light of the foregoing, it is hereby

**ORDERED AND ADJUDGED** that the Motion to Dismiss **[D.E. 32]** is **DENIED**.

24

Case No. 09-60973-CIV-ALTONAGA/Brown

**DONE AND ORDERED** in Chambers at Miami, Florida this 4th day of December, 2009.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record

25